UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAUL GENRICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01477-JRO-MG |
| | ) | |
| REAGLE Supt. Mr., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Paul Genrich, an inmate at Miami Correctional Facility, brought this action alleging violations of his Eighth Amendment rights when he requested to be in continuous segregation due to his mental health while he was incarcerated at Pendleton Correctional Facility ("Pendleton"). Dkt. 20. Most of the defendants have been dismissed already.[1] The only remaining defendant, Pendleton Warden Dennis Reagle, has moved for summary judgment, arguing in relevant part that he was not deliberately indifferent to Genrich's medical needs. Dkt. [68]. After considering the designated evidence, and Genrich's response, the Court agrees. Warden Reagle's motion is **GRANTED**. Final judgment shall issue by separate order.

---

[1] Genrich filed his complaint against both medical and Indiana Department of Correction ("IDOC") defendants. Medical Defendants were granted summary judgment on the exhaustion defense. Dkt. 65. Prior to filing for summary judgment, Defendant Dennis Reagle filed a motion to dismiss for failure to comply with an order compelling discovery responses. Dkt. 66. Because this Court elects to rule on the merits of Mr. Genrich's claims, this motion, dkt. [66], is **denied as moot**. Further, Mr. Genrich's motion to renew his motion for preliminary injunction, dkt. [73], is **denied** because the Court now grants Reagle's motion for summary judgment.

1

## I.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).  When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021).    It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  A court only must consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.    Fed. R. Civ. P. 56(c)(1)(A).  Failure to properly support a fact in opposition to a movant's factual assertion results in the Court considering the fact undisputed for the purpose of summary judgment.  Fed. R. Civ. P. 56(e).

## II. FACTUAL BACKGROUND

Because Reagle has moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Genrich and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

During the relevant time period, Dennis Reagle was the Warden at Pendleton. Dkt. 69-1 at 1. In March of 2023, Genrich was an inmate incarcerated at Pendleton in H-Cellhouse. *Id.* at 11.

### B. Genrich's Placement

On March 21, 2023, Genrich set a fire to clothes and paper in his cell. Dkt. 69-2 at 3. After officers removed him from his cell, Genrich reported to them that he was making weapons out of metal items he possessed, he had already made other weapons, and he was planning to murder another inmate or correctional staff. *Id.* He was then moved to G-cellhouse, a restrictive housing unit. Dkt. 69-1 at 11; *see also* dkt. 69-2 at 3.

On March 23, Genrich underwent a restrictive housing review and reported to the reviewing psychologist that he had thoughts of hurting himself and others. Dkt. 69-2 at 23-24. Later that day, he harmed himself using a plexiglass shank he had cut from the door of his cell and reported his conduct to officers. Dkts. 69-1 at 4 and 69-2 at 5. Medical staff checked him shortly thereafter. Dkt. 69-2 at 5.

On April 2, 2023, Genrich wrote a letter addressed to Warden Reagle— though this letter was not intercepted until April 11. The April 2 letter stated

3

that he was "not being taken seriously about how if [he was] placed back in population [he was] going to make a shank and [he was] going to try and murder someone, anyone, at random." Dkt. 69-1 at 1; Dkt. 69-1 at 4. Genrich further stated that he was "tired of being placed around other inmates," that if he was "placed in population again [he was] going to murder someone." *Id.* He said he needed to be placed in Department Wide Administrative Restrictive Housing or the New Castle Correctional Facility mental health unit. *Id.* Genrich also stated in the letter that he told an officer on March 30, 2023, that he needed to speak with a psychologist and stated that he was seen by a psychologist the next day. *Id.* at 2.[2]

Later, on April 2, a non-party correctional staff member observed that Genrich had cut himself and alerted medical personnel. Dkt. 69-2 at 6. Genrich was assessed by a nurse and escorted to medical. *Id.* The next day on April 3, Genrich was seen by a medical provider for suicidal and homicidal ideation, given a suicide risk screening, and recommended for close observation. Dkt. 69-2 at 63–76. He was also seen by medical staff that day for suicide monitoring. *Id.*

Genrich told medical staff during the April 3 assessment that he had made multiple knives in general population and had made staff aware that it was only a matter of time before he was going to hurt or kill someone. Dkt. 69-2 at 69. He further stated that being confined to restrictive housing was in his and

---

[2] On April 11, Genrich's April 2 letter was intercepted, and he received a disciplinary report for the letter's threatening statements. Dkt. 69-1 at 8-9. On April 25, he was found guilty at a disciplinary hearing for making these threats and received disciplinary sanctions, including sixty (60) days in disciplinary restrictive housing set to expire on August 18, 2023. Dkt. 69-1 at 9.

everyone else's best interest.  *Id.*  The medical provider assessing him determined that Genrich was to remain on suicide watch close observation, and mental health staff were to follow up daily to determine necessary placement.  *Id.*  He was seen for daily monitoring visits for two days before his suicide watch was discontinued on April 5, 2023, by a psychologist.  Dkt. 69-2 at 78–82.

On April 6 and April 13, Genrich was seen for a post suicide watch follow-up visit.  Dkt. 69-2 at 83–84, 121–122.  On April 6, he "denied any current thoughts of self-harm or suicidal ideation" but nonetheless reported struggling with both homicidal and suicidal ideation.  Dkt. 69-2 at 83.  On April 13, he denied thoughts of self-harm or suicidal ideation, and no struggles with suicidal ideation were reported.  Dkt. 69-2 at 121.

On April 11, Genrich's April 2 letter was intercepted, and he received a disciplinary report for the letter's threatening statements.  Dkt. 69-1 at 8-9.  On April 25, he was found guilty at a disciplinary hearing for making these threats and received disciplinary sanctions, including sixty (60) days in disciplinary restrictive housing set to expire on August 18, 2023.  Dkt. 69-1 at 9.

On June 19, 2023, Genrich was moved from restrictive housing to a general population housing unit.  Dkt. 69-1 at 2.  Later that same day, he was moved to the infirmary at Pendleton for self-harm.  Dkt. 69-2 at 123–126.  His wounds were cleaned and dressed, and he was escorted to HRU for monitoring in stable condition.  *Id.*  He was also seen for suicide monitoring.  *Id.*

On June 20, 2023, Genrich was seen for a provider visit for his self-inflicted lacerations and seen for a daily visit for suicide monitoring.  Dkt. 69-2

at 127–132.  During his provider visit, Genrich noted that he had been moved to a general population housing unit and further stated that he engaged in self-harm because he thought it was the best option in the moment.  *Id.* at 130.  In the psychologist's clinical notes, she charted, "[w]hile client is not currently reporting [suicidal ideation], he is reporting [homicidal ideation] if he is moved back to [general population].  Client will remain on [suicide watch] currently while it is determinized [sic] if he can return to GCH as opposed to GP."  *Id.* at 131.  The next day, Genrich was again seen for a daily suicide watch visit where he denied thoughts of self-harm or suicidal ideation.  *Id.* at 133–135.  He was then released from suicide watch and told that he would be moving back to restrictive housing.  *Id.*

On June 22, June 28, July 5, and July 19, Genrich was seen for post-suicide watch follow-up visits.  Dkt. 69-2 at 136–146.  Genrich did not report thoughts of self-harm or suicidal ideation at any of the visits but inquired with mental health professionals about mental health placement or SNAP placement. *Id.*

On July 30, 2023, non-party correctional staff discovered that Genrich had cut himself on both arms. Dkt. 69-2 at 7; Dkt. 69-2 at 164.  First responders and medical personnel responded, and Genrich was escorted to the Urgent Care Center where he was assessed and sent to an outside hospital via ambulance. *Id.*  At the hospital, medical staff reported that Genrich "denies any overt suicidality but states he gets very stressed and that makes him want to cut his arms." Dkt. 69-2 at 159.  Genrich returned to PCF from the outside hospital in

6

the morning hours of July 31, 2023, after receiving approximately 82 staples to repair the lacerations. *Id.* at 175–176. Genrich was provided with medication, assessed, and placed on suicide watch. *Id.* at 175–182.

On August 1, 2023, Genrich was seen for a daily suicide watch visit and denied thoughts of self-harm or suicidal ideation. Dkt. 69-2 at 183–189. Continued suicide watch was ordered. *Id.* at 183–185. The next day, Genrich was again seen for a daily suicide watch visit where he stated that he was ready to return to restrictive housing and did not have self-harm or suicidal thoughts. *Id.* at 190–191. He also "expressed some relief that he is going to be staffed for a [mental health unit] this week." *Id.* at 190. He was released from suicide watch on this date. *Id.*

On August 9, 2023, Genrich was seen for a one-week post suicide watch follow-up. *Id.* at 194–196. At this visit, he was informed that he was not accepted into a mental health unit but that it was agreed upon that he would not go to general population. *Id.* at 194. Genrich stated that if he was moved to general population, he would hurt himself to avoid hurting others. *Id.*

On or around August 14, 2023, Genrich submitted a grievance stating that he had been experiencing homicidal thoughts since March 20, 2023, was told he did not qualify for mental health housing, and was aware he would be released from restrictive housing on August 18 despite his desire to remain in segregation. Dkt. 69-2 at 10. On August 17, 2023, Warden Reagle was copied on an email from the IDOC Executive Director of Mental Health Services stating, "I know him from working with him at NCP. He is a true psychopath who is really having a

7

ton of homicidal thoughts.  Please do not release him from RHU tomorrow.  I will move him back to NCP or talk to classifications about long term RHU.  I'm speaking with him now and he will hurt someone.  He cannot do general population." Dkt. 72 at 7; *see also* dkt. 69-1 at 2.

On September 14, 2023, Genrich was seen for a monthly out-of-cell session.  Dkt. 69-2 at 197–198.  He was told that he would remain in restrictive housing until his transfer to the New Castle Correctional Facility mental health unit.  *Id.*  On September 22, 2023, it was determined that Genrich was appropriate for transfer to New Castle Correctional Facility due to his mental health needs and a request was made for his behavioral health code to be updated and transfer documents completed.  Dkt. 69-1 at 2-3.  Genrich was transferred to New Castle Correctional Facility on or around October 10, 2023.  Dkt. 69-1 at 3.

Warden Reagle testified that he was not aware of Genrich requesting any medical or mental health care that he did not receive, that he did not make decisions or determinations for Genrich being placed in or released from suicide watch, and he was not involved with providing care or making medical or mental health care decisions for Genrich.  Dkt. 69-1 at 3.

### III. DISCUSSION

The undisputed facts show that either Warden Reagle was unaware of Genrich's mental health condition and requests or, in any case, Genrich received adequate medical attention for his suicidal and homicidal ideation.  Thus,

8

Genrich cannot show that Warden Reagle acted with deliberate indifference to his medical needs.  His Eighth Amendment claim must be dismissed.

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals."  *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021).  "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'"  *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court assumes for purposes of the summary judgment motion that Genrich's mental health condition was objectively serious.  To avoid summary judgment, then, the record must allow a reasonable jury to conclude that Warden Reagle acted with deliberate indifference—that is, that he "consciously disregarded a serious risk to [Genrich's] health."  *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).  Deliberate indifference requires more than negligence or even objective recklessness.  *Id.* Rather, Genrich "must provide evidence that an official actually knew of and

9

disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

If a prisoner is under the care of medical experts, nonmedical prison officials, such as Warden Reagle, will generally be justified in believing that the prisoner is in capable hands and will not be liable for cruel and unusual punishment. *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005). In contrast, "nonmedical officials can 'be chargeable with . . . deliberate indifference' where they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir.2004)). Furthermore, a non-medical prison official can be liable for condoning or approving medical staff's refusal to provide care or impeding access to medical care. *See Arnett v. Webster*, 658 F.3d 742, 756 (7th Cir. 2011).

Here, no reasonable jury could conclude that Warden Reagle was deliberately indifferent towards Genrich's medical needs. On April 2, 2023, Genrich sent Warden Reagle a letter alleging that he needed to see a psychologist and that he was experiencing homicidal ideation towards fellow inmates. Dkt. 69-1 at 1. It is undisputed that Warden Reagle never opened or read the April 2 letter. Instead, a non-party IDOC staff member intercepted and reviewed it on April 11 and reported the contents for threatening conduct. *Id.* at 8-9. Also, Genrich had a psychologist visit the day after sending the letter on April 3. Dkt. 69-2 at 63-76. There is no evidence that Warden Reagle ever directly reviewed

10

the letter, and Genrich received the requested medical care immediately after he sent his request.

The only other interaction Genrich may have had with Warden Reagle was on August 14, 2023, when he filed a grievance alleging that he was lacking sufficient mental health treatment and was set to be transferred to general population despite expressing suicidal and homicidal ideation.  Dkt. 69-2 at 10. There is no evidence on the record that Warden Reagle reviewed this grievance. However, on August 17, 2023, Warden Reagle was copied on an email from the IDOC Executive Director of Mental Health Services stating "I know him from working with him at NCP.  He is a true psychopath who is really having a ton of homicidal thoughts.  Please do not release him from RHU tomorrow.  I will move him back to NCP or talk to classifications about long term RHU. I'm speaking with him now and he will hurt someone.  He cannot do general population." Dkt. 72 at 7.  Subsequently, mental health staff determined that Genrich was not appropriate for transfer to the general population.  Dkt. 69-2 at 197–198.

The evidence on the record reflects that Genrich received consistent healthcare from medical staff who were ultimately responsible for ensuring his mental health needs were properly assessed, and he was placed appropriately pursuant to his mental health status.  This is further reflected by the determination by mental health staffers and the IDOC Executive Director of Mental Health Services to continue Genrich's placement in segregation for his safety.  On numerous occasions throughout 2023, mental health providers provided thorough assessments of Genrich's risk for suicidality and made

11

frequent determinations regarding whether it was appropriate to change his placement status.  Dkt. 69-2 at 63–118, 121–122, 127–132, 175–198.  Thus, the record shows that even if Warden Reagle did know about Genrich's poor mental health, he ensured that the appropriate medical providers were involved and then deferred to them.  Furthermore, there is no evidence that Warden Reagle delayed or impeded Genrich's mental health treatment.

The Court acknowledges Genrich's argument that he suffered serious bodily injury by repeatedly cutting himself in his cell.  *See* dkt. 72 at 1–2.  But when he reported thoughts of self-harm, he was placed on suicide watch.  His acts of self-harm occurred only after he reported improvement and was appropriately taken off suicide watch.  Most importantly, between the March 21, 2023 fire in his cell and his October 10, 2023 transfer to New Castle, Genrich was housed either in restrictive housing or in the infirmary, except for a very brief move on June 19.  Dkt. 69-1 at 2.  In other words, Genrich received the housing arrangement he believed was most suitable for him.  And regardless, none of the unfortunate incidents of self-harm occurred as a result of Warden Reagle's deliberate indifference.

In sum, a jury could not conclude Warden Reagle was deliberately indifferent.  *See, e.g, Greeno,* 414 F.3d at 656 ("Perhaps it would be a different matter if [the nonmedical defendant] had ignored Greeno's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address Greeno's concerns."); *Burks v. Raemisch,* 555 F.3d 592, 595 (7th Cir.

2009) (a prison warden is entitled to relegate to medical staff the provision of medical care). Warden Reagle's motion for summary judgment is **granted** based on a lack of deliberate indifference. Accordingly, the Court need not address Warden Reagle's alternative qualified immunity argument.

## IV. MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

On August 13, 2025, Genrich filed a motion to renew his motion for preliminary injunction. Dkt. 73. At the outset, although Genrich's motion is titled "Emergency Motion to Renew Motion for Preliminary Injunction with Affidavit," Genrich has not previously filed a motion for a preliminary injunction. Rather, his complaint asks for both monetary damages and injunctive relief. The only relief that Genrich requests is to be placed in a mental health facility within IDOC and for IDOC to "monitor the way suicidal behavior is dealt with to [e]nsure people suffering are properly cared for and not punished for asking for help." Dkt. 1 at 9. After the filing of this complaint, Genrich filed an amended complaint which only asked for the injunctive relief that "the court warn the defendants against committing retaliatory acts against me." Dkt. 20 at 10.

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). To obtain a preliminary injunction a plaintiff first must show that: "(1) without this relief, [he] will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) [he] has some likelihood of prevailing on the merits of [his] claims." *Speech First, Inc. v. Killen*, 968 F.3d 628, 637 (7th Cir. 2020).

13

However, because the Court finds that summary judgment must be granted as to all claims against Warden Reagle, his motion for preliminary injunction must be denied. Accordingly, Genrich's Emergency Motion to Renew Motion for Preliminary Injunction with Affidavit, dkt. [73], is **denied as moot**.

## V. CONCLUSION

Defendant Reagle's motion to dismiss for failure to comply with order compelling discovery responses, dkt. [66], is **DENIED AS MOOT.**

Genrich's Emergency Motion to Renew Motion for Preliminary Injunction with Affidavit, dkt. [73], is **DENIED AS MOOT**.

Defendant Reagle's motion for summary judgment is **GRANTED.** Dkt. [68].

Final judgment will issue in a separate entry.

**SO ORDERED.**

Date: 7/8/2026

_____
Justin R. Olson
United States District Judge
Southern District of Indiana

Distribution:

PAUL GENRICH
918748
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Inmate Mail/Parcels
3038 West 850 South
Bunker Hill, IN 46914-9810

All Electronically Registered Counsel

14